# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-60715

United States Court of Appeals
Fifth Circuit

**FILED**
May 6, 2016

Lyle W. Cayce
Clerk

VINCENT TITO BAILEY,

      Plaintiff - Appellant

v.

MARSHALL L. FISHER. Commissioner, Mississippi Department of
Corrections; EMMITT L. SPARKMAN, Deputy Commissioner; BERTHA
SPIVEY, STG Coordinator; JAMES FILLYAW, Director O.S.; JOHNNIE
ELLIS, Classification Designer; EDDIE CATES, Assistant Director of O.S.;
MARGARET BINGHAM, Superintendent,

      Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:11-CV-300

Before REAVLEY, PRADO, and COSTA, Circuit Judges.

PER CURIAM:*

      Mississippi inmate Vincent Tito Bailey seeks judicial review of the
Department of Corrections's decision to isolate him on suspicion of gang
leadership. The magistrate judge dismissed Bailey's due process claim at the

---

      * Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH
CIR. R. 47.5.4.

No. 13-60715

pleading stage.   Because an intervening decision of this court provides additional guidance on how to evaluate such claims and the record does not make clear whether Bailey remains subject to the challenged conditions, we remand for further consideration.

I.

The following facts are drawn from Bailey's complaint, as supplemented during the August 14, 2012 *Spears*[1] hearing conducted by the magistrate judge.

Bailey is serving a 25-year sentence with the Mississippi Department of Corrections.   He was designated a Security Threat Group (STG) Leader—a gang leader—in December 2010.   At the time, he was being housed in general population at Louisville Correctional Facility.[2]   His STG Leader classification kicked off a series of housing transfers.

*Central Mississippi Correctional Facility (December 2010 to January 2011)*:   On or around December 22, 2010, Bailey was removed from general population at Louisville and transferred to the segregation unit at Central Mississippi Correctional Facility in Rankin County.   He received a reclassification hearing on December 28, 2010, which upheld his STG Leader classification.

*South Mississippi Correctional Institution (January 2011 to August 2011)*:   Approximately one month after his reclassification hearing, Bailey was transferred to South Mississippi Correctional Institution (SMCI) in Greene County.   Bailey remained at SMCI until August 2011, when he was transferred

---

[1] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985) (holding that an evidentiary hearing can be used in pro se cases in place of a typical requirement for a more definite statement), *overruled on other grounds by Neitzke v. Williams*, 490 U.S. 319, 324 (1989).

[2] We understand "Louisville Correctional Facility" to be the Winston/Choctaw County Correctional Facility, but use the terminology found in Bailey's filings.

No. 13-60715

to another facility.   He claims that his transfer was necessitated by the conditions at SMCI, which had been successfully challenged in court.

*Wilkinson County Correctional Facility (August 2011 to June 2012; September 2012 to unknown)*:   Between August 2011 and June 2012, Bailey was kept in the segregation unit at the Wilkinson County Correctional Facility (WCCF) in Woodville, Mississippi.   He was transferred back to general population in June 2012, but returned again to segregation in September 2012. It is unknown whether Bailey is still in segregation.

## II.

After his December 28, 2010 reclassification hearing, Bailey pursued a two-step administrative appeal process within the prison system.   After both levels of appeal were denied, he brought this lawsuit.

By consent, the case proceeded before the magistrate judge.   At the *Spears* hearing held August 14, 2012, Bailey informed the court that he had been released from segregation two months prior.   According to a motion for injunctive relief filed two months later, however, Bailey was returned to segregation following the hearing.   As noted above, it is unknown whether Bailey remains in segregation.

More than a year after the *Spears* hearing, the magistrate judge dismissed Bailey's claims for "failure to rise to the level of a constitutional violation."   He noted that Bailey does not have a "protectable liberty or property interest in his custodial classification" or a "constitutional right to be housed in a particular prison facility."   He then ruled that the restrictive conditions described "do not rise to the level of a constitutional violation."

## III.

Ordinarily an inmate has no recognized due process interest in his custodial classification. *Moody v. Baker*, 857 F.2d 256, 257–58 (5th Cir. 1988).

3

No. 13-60715

A state-created liberty interest may arise, however, when a custodial classification results in conditions of confinement that "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

Solitary confinement is typically viewed as an ordinary, expected, and permissible incident of prison life. *See, e.g., Pichardo v. Kinker*, 73 F.3d 612, 612 (5th Cir. 1996); *Luken v. Scott*, 71 F.3d 192, 193 (5th Cir. 1995). In fact, *Sandin* itself was a disciplinary segregation case. 515 U.S. at 475–76. But solitary confinement can be used in a way that "imposes atypical and significant hardship." *Hernandez v. Velasquez*, 522 F.3d 556, 562–63 (5th Cir. 2008) (quoting *Sandin*, 515 U.S. at 484). The Supreme Court in *Wilkinson v. Austin*, 545 U.S. 209 (2005), recognized that the use of solitary confinement in Ohio's Supermax facility crossed the line. *Id.* at 223–24.

Since the magistrate judge dismissed Bailey's case, we have found that two prisoners under decades-long closed-cell restriction (CCR)—a type of confinement similar to the solitary confinement in *Wilkinson*—likewise had a cognizable due process interest in Louisiana's prisoner classification system. *See Wilkerson v. Goodwin*, 774 F.3d 845, 855–57 (5th Cir. 2014).

The conditions Bailey alleges he faced at SMCI are similar in many respects to the conditions in *Wilkinson* and *Wilkerson*. He alleges that he was in lockdown 23–24 hours a day in a one-person cell, the same as plaintiffs in *Wilkinson* and *Wilkerson*. *Wilkinson,* 545 U.S. at 214; *Wilkerson*, 774 F.3d at 849, 855. His cell was outfitted with a solid steel door, with the only opening controlled by prison guards for purposes of meals and prisoner count—a set-up nearly identical to the Supermax facility at issue in *Wilkinson*. 545 U.S. at 214. This set-up functionally prohibited cell-to-cell conversation, as in *Wilkinson*, although the inmates at SMCI apparently improvised by passing

4

written notes.[3]  On the days that Bailey left his cell to exercise, he remained isolated from other prisoners, as in *Wilkerson*.  774 F.3d at 855.  Visitation was either non-existent (in Phase 1) or rare (once every 90 days in Phase 2), and strictly no contact, as in *Wilkinson*.[4]  545 U.S. at 214; *compare Wilkerson*, 774 F.3d at 855 (inmate permitted "some" contact visits).

According to Bailey, he had no access to any privileges or programming at the prison—such as religious gatherings, educational and vocational programs, entertainment, canteen, or packages.  Similar restrictions were noted in *Wilkerson*.  *See* 774 F.3d at 849 (inmates on CCR faced restrictions on "personal property, reading materials, access to legal resources, work, and visitation rights," and could not "attend religious ceremonies" or "take advantage of educational opportunities [and] training" available to other inmates) (quoting the district court opinion).

Finally, while at SMCI, Bailey confronted restrictive conditions not found in either *Wilkinson* or *Wilkerson*.  Telephone use was either prohibited (in Phase 1) or rare (once a month in Phase 2).  *Compare Wilkerson*, 774 F.3d at 855 (inmate allowed telephone privileges).  He showered only three times per week.  *Compare id.* at 849, 855 (inmate allowed to shower every day).  And any time he left his cell, he was handcuffed through a "mailbox"-like

---

[3] The details of the inmates' note-passing system are unclear.  In his motion for summary judgment brief, Bailey wrote: "Some guys just resulted [sic] to communicating by fishing slidding [sic] strings attached to toothpaste under the door to pass messages."  His affidavit in support of summary judgment described: "When it was noisy communication was reduce [sic] to sliding cars or what they called caddilacs [sic] across the floor with little note [sic] on them."

[4] There are different phases within STG segregation.  To graduate from Phase 1, the inmate must renounce his gang affiliation, debrief with prison officials, and remain Rule Violation Report (RVR) free for 6 months.  The minimum amount of time in STG segregation is one year; there is no upper limit.

structure—minimizing physical contact with prison guards—and strip searched.

Based on the allegations in Bailey's pleadings, we see little difference between the conditions at SMCI and the Supermax facility in *Wilkinson*, and his SMCI confinement may have been more restrictive than the CCR in *Wilkerson*.

The conditions Bailey was subject to at WCCF diverge slightly from SMCI. Most notably, Bailey was allowed to use the telephone at WCCF. He does not allege that he was strip searched every time he left his cell. He also had a couple of privileges restored to him, including the ability to watch television and to purchase from canteen. In all other respects, however, his confinement at WCCF allegedly involved the same limitations as his confinement at SMCI. This moves the conditions Bailey allegedly faced at WCCF closer to those at issue in *Wilkerson*. *See* 774 F.3d at 855 (acknowledging that CCR is less restrictive than the Supermax prison in *Wilkinson* because, among other things, inmate was allowed "some contact visits, telephone privileges, peer counseling, and correspondence courses").

*Wilkerson* had not been issued when the magistrate judge ruled in this case, so he did not have benefit of the Fifth Circuit's guidance. And to the extent that the magistrate judge considered *Wilkinson,* he did not explain his grounds for distinguishing it when he dismissed Bailey's claims.[5]

All that being said about the ways in which the day-to-day conditions Bailey alleges are similar to those in *Wilkson* and *Wilkerson*, there are two significant differences. First, Bailey gives no indication that placement in STG

---

[5] For example, the magistrate judge found that Bailey "still had access to privileges, albeit in a limited fashion, and not to his liking." He did not explain what privileges Bailey had access to, and Bailey's pleadings and the *Spears* hearing transcript provide no insight.

segregation impacted his release date in any way.  Courts are particularly concerned when solitary confinement triggers such repercussions.  *See, e.g., Wilkinson*, 545 U.S. at 224 (fact that placement in Ohio's Supermax facility "disqualifies an otherwise eligible inmate for parole consideration" is one of two components distinguishing it from "most solitary confinement facilities"); *but see Luken*, 71 F.3d at 193 (loss of opportunity to earn good-time credits in administrative segregation is too "speculative" and "collateral" to create a liberty interest in custodial classification).  The absence of a negative impact on Bailey's possible release date is not fatal, however—the CCR in *Wilkerson* also lacked parole ramifications.  *See* 774 F.3d at 855.

The other difference, and the more significant one, relates to the duration of the confinement in the restrictive conditions.  *Id.* at 854 (explaining that both the "severity of the restrictive conditions and their duration [are] key factors" in determining whether an inmate has a liberty interest in his custodial classification).  In essence, courts employ a sliding scale, taking into account how bad the conditions are *and* how long they last.  *See id.* (collecting and comparing cases from other circuits).  On such a sliding scale, truly onerous conditions for a brief period of time may not be atypical; less onerous conditions for an extended period of time may be.  As described in the Eighth Amendment context:

> [T]he length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards.  A filthy, overcrowded cell and a diet of "grue" might be tolerable for a few days and intolerably cruel for weeks or months.

*Hutto v. Finney*, 437 U.S. 678, 686–87 (1978).[6]

---

[6] Although *Hutto* was an Eighth Amendment case, this passage has been cited by courts grappling with the issue presented here: whether a term of segregated confinement is

No. 13-60715

On this aspect of Bailey's claim, although his confinement does not approach the duration at issue in *Wilkinson* and *Wilkerson*, the record is wanting about the actual duration of his confinement under the alleged conditions and whether it is ongoing. The magistrate judge referred to Bailey's release from segregation in June 2012 when he dismissed Bailey's due process claims. But before this ruling, and only two months after the *Spears* hearing in October 2012, Bailey moved for injunctive relief because he had been returned to segregation. Four months after that, he sought to amend his complaint to add a retaliation claim based on his continued segregation. Both of these motions were denied at the same time that the magistrate judge dismissed the underlying due process claims.

If Bailey's segregation ended in June 2012, he likely has failed to present a claim of "constitutional proportions." The Fifth Circuit recently suggested that two and a half years of segregation is a threshold of sorts for atypicality, *Wilkerson*, 774 F.3d at 855, such that 18–19 months of segregation under even the most isolated of conditions may not implicate a liberty interest.[7] *See also Hernandez*, 522 F.3d at 563 (lockdown in "a shared cell for twelve months with permission to leave only for showers, medical appointments, and family visits" not an atypical or significant hardship). Thus, although the magistrate judge failed to address the similarity between the conditions alleged and the

---

sufficiently atypical to trigger a due process interest. *See, e.g., Brown v. Or. Dept. of Corr.*, 751 F.3d 983, 988 (9th Cir. 2014); *Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003).

[7] Some other circuits have seemed to establish shorter thresholds. The Seventh Circuit recently rejected a "presumptive minimum" of six months for segregated confinement due process claims. *Kervin v. Barnes*, 787 F.3d 833, 837 (7th Cir. 2015). Similarly, the Second Circuit instructs lower courts to rule on the basis of a "detailed factual record" regarding the conditions of confinement unless the time spend in segregation was "exceedingly short," i.e. "less than 30 days." *Davis v. Barrett*, 576 F.3d 129, 135 (2d Cir. 2009) (internal quotation marks and alteration omitted).

No. 13-60715

Supermax facility in *Wilkinson*, the omission was likely harmless, assuming that segregation had truly ended.

But, as explained above, we cannot discern from this record whether the segregation has ended. If Bailey remains in segregation today, he has been isolated for over five years, with only a few months of relief in the interim.[8]

* * *

The duration of Bailey's confinement is a necessary component in the *Sandin* analysis. We therefore vacate the JUDGMENT dismissing Bailey's complaint and REMAND the case where it can be determined whether Bailey is still subject to the conditions he challenges. The court can then assess whether, in light of conditions and duration of the segregated confinement, Bailey has sufficiently alleged a state-created liberty interest in his custodial classification.[9]

---

[8] It may be the case that any resumption of segregation was not factually connected to Bailey's original claims. But the magistrate judge's ruling does not make such a finding, and Bailey's motion for injunctive relief suggests that the two confinements are related. The state's opposition to injunctive relief did not disclose the basis of Bailey's continued segregation.

[9] Of course, it may also be the case that even if Bailey has established a liberty interest, the state provided him with the process that was due.